**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

FAIR HOUSING COUNCIL OF SOUTH
TEXAS,

              Plaintiff,

    v.

LENNAR CORPORATION,

              Defendant.

Case No. 5:23-cv-1415

## COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

### NATURE OF THE ACTION

1.      Plaintiff San Antonio Fair Housing Council, Inc., d/b/a Fair Housing Council of South Texas ("FHCST"), brings this action against Defendant Lennar Corporation ("Defendant"). Plaintiff seeks a declaratory judgment, permanent injunctive relief, and damages resulting from discrimination because of disability in the provision of housing. This action arises under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and the Texas Fair Housing Act, Tex. Prop. Code § 301.001, *et seq.*

2.      Defendant claims to be the second largest new homes builder in the United States, with construction operations in 26 states including Texas. In fiscal year 2022, Lennar delivered over 66,000 new homes, collected $33.7 billion in revenue, and had net earnings of $4.6 billion. In Texas alone, Lennar delivered nearly 13,000 homes, collected over $4 billion in revenues, and had net earnings topping $1.2 billion.

3.      Defendant's "homebuilding mission is focused on the profitable development of residential communities." The first "key element" of Defendant's strategy to achieve this mission

is "Strong Operating Margins" which it achieves by "reducing selling, general and administrative costs."[1] Defendant's policies and practices are designed to minimize or eliminate any administrative duties, and even when—as it appears from Plaintiff's investigation—those duties are affirmatively required by state and federal law.

4.     Defendant maintains policies and practices that discriminate against homebuyers with disabilities. In chief, Defendant has a strict policy of not allowing any changes to building plans during the pre-construction and construction process, including where such changes are necessary for a prospective homebuyer or a homebuyer's family member with a disability to use and enjoy the home. Defendant refuses to consider—let alone grant—any exceptions to its policy, even if the homebuyer is willing to pay for the costs of any modifications. This policy makes housing inaccessible and/or prohibitively costly for people with disabilities. If a homebuyer with a disability requires a wider doorway or hallways to accommodate a wheelchair or needs a roll-in shower in lieu of a bathtub, it would be substantially more costly—if not impossible—to retrofit a home once complete instead of easily incorporating the changes while the home is being initially constructed. For example, price estimates to widen a single, already-built doorway run up to $2,500, while the cost to build a doorway slightly wider in the first place is negligible.

5.     Federal and state anti-discrimination laws prohibit the denial of requests for reasonable accommodations from rules, policies, or practices when necessary to give a person with a disability equal opportunity to use and enjoy a dwelling. In this context, requests for an exception to Defendant's policy of prohibiting changes to building plans are requests for reasonable accommodations. Anti-discrimination laws also prohibit the denial of requests for

---

[1] *Lennar 2022 Form 10-K*, Lennar Corp. 2 (Nov. 30, 2022),
https://investors.lennar.com/~/media/Files/L/Lennar-IR-V3/documents/annual-reports/2022-annual-report-v1.pdf.

reasonable modifications that may be necessary to afford a person with a disability full enjoyment of their home, provided that the person pay for related expenses. Joint guidance from the U.S. Department of Justice and the U.S. Department of Housing and Urban Development—which is regularly relied upon by developers, homebuyers, regulators, and courts—confirms that reasonable modifications include "structural changes to a dwelling unit that has not yet been constructed," including changes such as site grading or installing accessible bathroom features made while a home is under construction. In this context, requests for alterations to building plans—including for wider hallways, changes to grading, and accessible bathrooms—are requests for reasonable modifications. Reasonable accommodation and reasonable modification requests must be assessed on a case-by-case basis and housing providers may not establish blanket policies categorically denying certain types of requests.

6.     Plaintiff FHCST uncovered Defendant's discriminatory policies and practices after receiving a complaint that homebuilders in the San Antonio area were not considering reasonable accommodations and modifications during the design and construction process. FHCST's investigation of Defendant's properties confirmed that Defendant was one such builder.

7.     Defendant's unlawful policies and practices have frustrated and impaired Plaintiff's mission to promote fair housing and eliminate discriminatory housing practices across South Texas. FHCST has been forced to divert significant resources to identify and counteract Defendant's conduct, which limits the potentially accessible homes to which FHCST can refer homeseeking clients with mobility impairments. FHCST launched an education and outreach campaign aimed at residents of Defendant's new subdivisions, to sales agents located at Defendant's many sales offices located in FHCST's service area, and to housing consumers. In

addition, FHCST has educated residents regarding Defendant's policies and conducted a fulsome investigation of Defendant's subdivisions, including testing and resident surveys. Defendant's conduct has perceptibly impaired FHCST's mission because the resources expended in relation to Defendant's conduct have forced the organization to curtail or cancel other planned activities essential to its mission—including researching potential discrimination in apartment rentals, in-person education and outreach activities, and tester recruitment events—in an effort to mitigate the real-world impact of Defendant's unlawful conduct.

8.       Plaintiff seeks injunctive relief, declaratory relief, and damages for Defendant's continuing violation of the federal Fair Housing Act, 42 U.S.C. § 3604, and the Texas Fair Housing Act, Tex. Prop. Code § 301.025. Defendant has made clear that it will maintain its discriminatory policies and practices, meaning that absent judicial redress, the consequent injury to FHCST will continue.

## JURISDICTION AND VENUE

9.       This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because it arises under the laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367. Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202.

10.       Venue is proper in this District under 28 U.S.C. § 1391(b) because most events and omissions giving rise to Plaintiff's claims occurred in this District, Plaintiff's principal place of business is in this District, and Defendant engages in significant business in the District.

## PARTIES

11.     Plaintiff Fair Housing Council of South Texas is a 501(c)(3) nonprofit organization incorporated in Texas, with its principal place of business at 4414 Centerview Drive, Suite 229, San Antonio, Texas 78228. It is dedicated to promoting fair housing and eliminating discriminatory housing practices in the areas of rental housing, real estate sales, mortgage lending, and homeowners' insurance across South Texas. FHCST works to eliminate housing discrimination and to ensure equal opportunity for all people through advocacy, education and outreach, counseling, and investigation.

12.     Defendant Lennar Corporation is a corporation incorporated in Delaware with its headquarters in Miami, Florida. Lennar maintains extensive operations in the State of Texas. In the San Antonio region alone, Lennar currently has over 242 homes on the market across 37 subdivisions as of November 2023.

13.     In acting or failing to act as alleged herein, Defendant was acting through its employees, officers, and/or agents and is liable on the basis of the acts and omissions of its employees, officers, and/or agents.

14.     In acting or failing to act as alleged herein, each employee, officer, or agent of Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Defendant as principal.

## FACTUAL BACKGROUND

### A.  The Need for Accessible Housing in South Texas

15.     There are hundreds of thousands of people in South Texas with ambulatory and other disabilities. These individuals face enormous barriers in the housing market due to the lack

of accessible housing in the region, barriers that are compounded when they are subjected to discriminatory treatment.

16.     An individual with a physical disability may require various modifications to a residence to afford them full enjoyment of their home. To get into the home, a person with a disability may require changes to grading so that they can enter from the street or through the garage. To move around the home, a person with a disability may require widened doorframes through which their wheelchair or walker can pass. To use the bathroom, a person with a disability may require installation of grab bars and a roll-in shower. These alterations enable people with disabilities to perform basic functions of daily life; without them, their use and enjoyment of their homes will be severely diminished, if not entirely compromised.

17.     The vast majority of existing housing in America is inaccessible to people with disabilities. According to one study, just 0.15 percent of housing units in the United States are fully wheelchair accessible and under 4 percent of housing units could be considered livable by people with moderate mobility difficulties, meaning the units have accessible bathrooms with grab bars and people who have difficulty walking independently can navigate them. And only a third of units are potentially modifiable (having some structural features necessary for accessibility but in need of additional modifications), locking out people with mobility-related disabilities from most of the existing housing market.

18.     Newly constructed homes offer an important, potentially accessible alternative for people with disabilities, particularly because these homes may be modified during planning and construction to meet the prospective occupant's accessibility needs. Most newly constructed homes are not custom built: per 2021 estimates, just 17.6% of new single-family homes were custom built. As a result, homebuyers with disabilities must rely on modifications to existing

building plans in order to accommodate their disability-related needs. By refusing to allow such modifications during the pre-construction and construction phases, Defendant's discriminatory policies and practices have the effect of constricting the already limited pool of accessible housing for people with disabilities in South Texas.

**B. Legal Requirement to Grant Requests for Reasonable Modifications and Reasonable Accommodations**

19.     The federal Fair Housing Amendments Act (FHAA) and its Texas state law analog prohibit discrimination in the sale or rental of housing because of disability. The text of the FHAA states that discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B); Tex. Prop. Code Ann. § 301.025(c)(2). Where there is a disability-related need, a requested accommodation must be granted so long as it does not impose an undue financial and administrative burden or fundamentally alter the nature of the provider's operations. This determination of reasonableness must be made on a case-by-case basis based on various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations.

20.     In the context of this litigation, a request for an exception from Defendant's policy prohibiting changes to building plans prior to and during construction in order to allow for an accessibility-related change is one for a reasonable accommodation.

21.     The text of the FHAA also states that discrimination includes a refusal to permit, at the expense of the resident, reasonable modifications that are necessary to afford a person with

disabilities the full enjoyment of the home. 42 U.S.C. § 3604(f)(3)(A); Tex. Prop. Code Ann. § 301.025(c)(1).

22.     Requests for reasonable modifications may be made before, during, or after home construction. Joint guidance from the U.S. Department of Justice and the U.S. Department of Housing and Urban Development states that "[a] person may make a request for a reasonable modification at any time. An individual may request a reasonable modification of the dwelling at the time that the potential tenancy or purchase is discussed." The guidance elaborates that accessibility-related "structural changes to a dwelling unit that has not yet been constructed" are to be considered reasonable modifications.[2]

23.     The joint guidance lists examples of reasonable modification requests, which closely match the requests that are the subject of this litigation: (1) a buyer with a mobility disability purchasing a single family dwelling under construction who asks for a bathroom sink with a floorless base cabinet with retractable doors that allows the buyer to position his wheelchair under the sink; (2) a buyer with a mobility disability purchasing a ground floor unit in a detached townhouse who requests that the builder grade the entrance to eliminate the need for the step at the front door; and (3) a buyer with a mobility disability who wishes to have grab bars installed to make the bathroom accessible.

24.     The joint guidance further clarifies that if a purchaser with a disability needs different or additional features added to a unit under construction or about to be constructed, the purchaser is only responsible for any additional cost that the structural changes might create over and above what the original design would have cost.

---

[2] Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Modifications Under the Fair Housing Act at 15 (Mar. 5, 2008), https://www.hud.gov/sites/documents/reasonable_modifications_mar08.pdf

### C.  Complaints Received by FHCST

25.     Over the past decade, FHCST has observed a marked increase in the number of disability discrimination complaints filed with its office, and ensuring equal housing opportunities for people with disabilities makes up a substantial share of its current workload. Many of these complaints involve housing providers denying requests by people with disabilities for reasonable accommodations or reasonable modifications.

26.     A complaint brought to FHCST's attention an example of discrimination against people with disabilities: homebuilders' refusals to make reasonable modifications, at a requester's expense, to pre-construction plans that would make the homes accessible for residents with disabilities. These refusals impose enormous costs on people with disabilities. While alterations to doorframe widths or to grading could be made with little or no additional cost during construction, the cost of these changes balloons once a home has already been substantially constructed; for example, to widen a doorway, the existing doorway must be removed, modifications to the surrounding wall may be required, and labor costs are increased and duplicated. Since the homebuyer will bear these costs in either instance, builders' refusals to allow the modifications during construction needlessly drive up the cost of acquiring an accessible home. In addition, homebuyers may end up purchasing homes with features they cannot use—such as a bathtub or inaccessible shower—which they must then pay to remove and replace with accessible features. And even if a homebuyer is both willing and able to pay these higher costs, retrofitting may delay their moving into their home while the alterations are made, and some changes, such as widening hallways, may be impracticable.

**D. FHCST's Investigation Confirms that Defendant Maintains Policies and Practices That Discriminate Against People with Disabilities**

27.     In 2021, responding to a complaint about area homebuilders not permitting pre- and during construction modifications, Plaintiff began an investigation of Defendant's policies and practices regarding reasonable modification and reasonable accommodation requests made prior to and during home construction.

28.     As Plaintiff initiated its investigation it was aware that Defendant accounts for a large share of the market for new homes in the region and thus has an outsized impact on the availability of accessible homes for people with disabilities in the area FHCST serves. The harmful impact of such a policy on Plaintiff and area residents with disabilities by a builder with such a large presence in FHCST's service area compelled the organization to conduct a full investigation to identify the nature and scope of Defendant's reasonable accommodation and modification policies.

29.     On September 20, 2021, FHCST conducted a disability sales test at Medina Landing, a subdivision of new single-family homes constructed by Defendant and located in San Antonio. The tester spoke with one of Defendant's sales representatives and inquired about purchasing a home at Medina Landing. The tester asked the representative if they could add specific accessibility features to the home during the construction process, at the tester's expense, which were needed due to her husband's disability since he used a wheelchair, including accessible routes from the street, garage door, and back patio into the home, along with 32-inch-wide doorframes that would afford her husband full use of the home.

30.     In response, the representative informed the tester that Defendant could not make modifications because Lennar is not a custom homebuilder. When the tester asked if they could accommodate the changes if the tester paid for them, the representative said no and informed the

tester that she would have to make the adjustments herself after she purchased the home, which could not be until construction was substantially completed. In addition, the representative suggested that the tester purchase a more expensive home above the price range she provided, which the representative indicated would provide some of the requested accessibility features.

31.     In so doing, Defendant denied the tester's request for a reasonable accommodation from its policy of disallowing accessibility-related changes to building plans, denied the tester's request for reasonable modifications to be made to the building plan at the tester's expense, and steered the tester to a higher priced housing option due to the disability-related needs identified by the tester.

32.     On September 30, 2021, FHCST conducted a disability sales test at Paloma, a subdivision of new single-family homes constructed by Defendant and located in Converse, Texas. The tester spoke with one of Defendant's sales representatives and inquired about purchasing a home at Paloma.  The tester asked the representative if they could add specific accessibility features to the home during the construction process, at the tester's expense, which were needed due to her husband's disability since he used a wheelchair, including accessible routes from the street, garage door, and back patio into the home, along with doorframes wide enough for his wheelchair that would afford her husband full use of the home.

33.     In response, the representative informed the tester that Defendant does not allow any modifications to be made while the home is being built. The representative further informed the tester that these are alterations the tester would need to seek out after the home closes. The tester then asked the representative if they could make an exception because the modifications were needed due to a disability. In response, the representative said unfortunately not. The representative then recommended that the tester look at a more expensive floorplan.

34.     In so doing, Defendant denied the tester's request for a reasonable accommodation from its policy of disallowing accessibility-related changes to building plans, denied the tester's request for reasonable modifications to be made to the building plan at the tester's expense, and steered the tester to a higher priced housing option due to the disability-related needs identified by the tester.

35.     On September 15, 2022, FHCST conducted a disability sales test at Knox Ridge, a subdivision of new single-family homes constructed by Defendant and located in Converse, Texas. The tester spoke with one of Defendant's sales representatives and inquired about purchasing a home at Knox Ridge. The tester asked the representative if Defendant could add specific accessibility features to the home during the construction process, at the tester's expense, which were needed due to her husband's disability since he used a wheelchair, including grab bars, a roll-in shower, accessible routes from the garage door and back patio into the home, and doorframes wide enough for his wheelchair.

36.     In response, the representative replied that unfortunately Defendant could not make those changes because Lennar is strictly an inventory-based builder. The representative added that such changes could not be made because sales representatives cannot put the homes under contract until the home is built to a certain stage.  The representative told the tester that she could not add the modifications before the build process or change the plans. The tester asked if they could make an exception and incorporate these accessibility features into the plans before construction had begun. The representative replied that she was prohibited from making an exception because Lennar is not a custom builder.

37.     In so doing, Defendant denied the tester's request for a reasonable accommodation from Defendant's policy of disallowing accessibility-related changes to building

plans and denied the tester's request for reasonable modifications to be made to the building plan at the tester's expense.

38.     Taken together, these tests reveal not only a troubling pattern of discriminatory conduct, but a formalized, discriminatory policy: in defiance of the explicit requirements of state and federal law, Defendant steadfastly refuses to grant, or even to consider, *any* requests for reasonable modifications to building plans—no matter how reasonable or necessary those modifications may be. This blanket approach is contrary to the legal framework that applies to these requests, which requires individualized consideration.

39.     This investigation also revealed that Defendant has a policy of not allowing buyers to close on their homes until the home has been built to a certain stage. This policy causes an adverse impact on homebuyers with disabilities because they cannot change the grading during the construction process in order to incorporate accessible routes into and around the home or modify the building frame to incorporate necessary accessibility features. Consequently, this policy causes higher retrofitting costs for homebuyers with disabilities needing accessibility-related modifications that could have been made during the construction of the home. Defendant's policy thus has an adverse disparate impact on people with disabilities by disproportionately denying people with disabilities an equal opportunity to obtain accessible housing. These policies and practices are not justified by any legitimate business need or necessity and cause injury to Plaintiffs and others.

40.     Based on its findings through the tests and other investigation, FHCST engaged in an education and outreach campaign to help ensure that prospective and current residents in Defendant's communities were aware of the requirements for reasonable accommodations and

modifications in the context of new home construction. FHCST also reached out to Defendant's staff to ensure that they were aware of the relevant fair housing requirements.

41.     FHCST filed a complaint with HUD on September 19, 2022, challenging Defendant's discriminatory conduct. HUD referred the matter to the Texas Workforce Commission, which investigates fair housing complaints under state law. The complaint is currently pending.

42.     Defendant has refused FHCST's attempts to resolve its claims without resorting to litigation. In response to a letter describing the results of the tests and why Defendant's policy and practices violate the fair housing laws, Defendant's counsel stated that "Lennar's policies concerning requests like those made by the supposed testers are based on years of experience as a production builder," and that the testers requests were not reasonable because "if Lennar could increase its home sales without incurring excessive costs it would do so." These statements verify the existence of Defendant's formalized policy of refusing requests for reasonable modifications to building plans and evince a conscious, willful disregard for the clear requirements of disability discrimination statutes.

### INJURIES TO PLAINTIFF

43.     Plaintiff FHCST has suffered substantial, particularized, and concrete injuries as a direct result of Defendant's unlawful conduct in the San Antonio region.

44.     Defendant's unlawful conduct, policies, and practices have frustrated and obstructed FHCST's mission and ongoing work, forced it to divert its resources to identify and counteract Defendant's conduct, and curtailed its other activities.

45.     FHCST's mission is to ensure that that people in South Texas have equal housing opportunities. FHCST receives fair housing complaints, investigates them, and counsels and

advocates for individuals who have been victims of housing discrimination. Plaintiff conducts educational programs and activities including, but not limited to, trainings, information sessions, and community events. FHCST also works to increase the awareness of policymakers of fair housing issues by meeting with local, state, and federal officials to ensure comprehensive fair housing laws and policies.

46.     As part of its counseling work, FHCST helps people with disabilities within its service area to find accessible housing that meets their needs. Because people with disabilities are likely to have lower incomes than the general population,[3] FHCST generally looks to identify homes that are available at affordable prices and that are—or can be modified to be—accessible. And since the stock of existing housing is largely if not entirely inaccessible for people with disabilities, opportunities for new construction homes that are built or can be modified to be accessible are often the most practical option for homebuyers.

47.     Defendant's discriminatory conduct frustrates FHCST's mission by interfering with its mission-related activities, impairing its ability to achieve its goals of ensuring equal access to housing opportunities, harming the communities that FHCST serves, and making it more difficult for FHCST to serve those communities. Defendant controls a huge share of the market for affordable, new construction homes in the San Antonio region. At the time of filing, nearly 40% of new construction homes priced under $250,000 in San Antonio are sold by Defendant, according to realtor.com. Defendant's policy thus significantly reduces the number of affordable, accessible housing opportunities available to people with disabilities in FHCST's service area by preventing people with disabilities from requesting modifications prior to

---

[3] According to the 2023 Annual Disability Statistics Compendium, the median income for working-age people with disabilities is 19% lower than working-age people with no disability.

construction to make homes accessible. As a result, Defendant concretely impairs FHCST's housing counseling work by substantially constraining the housing opportunities FHCST is able to identify for people with disabilities.

48.    FHCST has suffered damages because it was compelled to investigate Defendant's discriminatory practices in the region based on a complaint it received about denial of requests for reasonable accommodations and modifications in the context of new homes construction. It suffered additional damages when—as a result of the conduct uncovered by its investigation of Defendant—it was forced to divert scarce resources to counter Defendant's discriminatory policy and practices.

49.    FHCST has a small staff and had to divert their limited time and incur expenses to continue the investigation after it showed that Defendant likely maintained a policy or practice of unlawfully denying reasonable accommodation and modification requests. The expenditure of resources was necessary to determine the degree and scope of Defendant's noncompliance.

50.    FHCST diverted staff time and resources to engage in outreach to the potentially affected residents within its service area to educate them regarding their fair housing rights in relation to the types of unlawful discrimination in which Defendant was engaging. These education efforts included sending direct educational mailings to residents in Defendant's communities with information about homebuyers' right to request reasonable accommodations and modifications, conducting a mail survey of the residents that included information about their right to request reasonable accommodations and modifications and other fair housing protections, and publishing social media advertisements regarding homebuyers' rights to request reasonable modifications in new, pre-construction homes. In addition, FHCST's education

efforts included sending educational mailings to sales agents who work at Defendant's many sales offices located in FHCST's service area.

51.     In carrying out activities, for which it had not budgeted time or money, to counteract the harm caused by Defendant, Plaintiff was forced to divert significant staff time and funds away from other planned activities. FHCST cancelled several planned activities in Webb County, including researching potential discrimination in the rental of apartment buildings in the County, in-person education and outreach activities, and tester recruitment events. FHCST's inability to engage in its typical activities for achieving its mission in Webb County impaired its efforts to achieve its goals of ensuring equal access to housing opportunities. FHCST is the only organization conducting these advocacy, education and outreach, counseling, and investigation activities in this part of its service area. Consequently, FHCST was not able to provide residents within its service area with counseling, referral, advocacy, and other services that would have furthered FHCST's mission of ensuring that people in South Texas have equal housing opportunities.

52.     These activities were important to achieving FHCST's mission because the likely rental discrimination in Webb County was preventing families in FHCST's service area from obtaining the housing of their choice in a manner free from discrimination. The education and outreach efforts in the County would have been a primary means for the organization to distribute fair housing related information to the communities it serves in Webb County. These efforts would have increased awareness and understanding of fair housing laws for both customers and housing providers and established the basis for future referrals from residents in the County. The cancellation of these activities therefore reduces the number of people FHCST is able to serve. Further, tester recruitment is necessary to FHCST's mission in order to ensure

the organization has the human resources to determine whether discrimination is likely occurring and, where it is, to counsel the residents affected and to educate the discriminating housing providers about fair housing requirements. The cancellation of tester recruitment events frustrates FHCST's mission by impairing its ability to conduct future testing activities.

53.     The drain on staff time caused by having to investigate and counteract Defendant's discriminatory conduct also prevented FHCST from timely applying for new grants and funding sources. Outside grants and funding are the primary sources of income for the organization and applications for new grants and funding sources are necessary to FHCST's survival and ability to pursue its mission.

54.     Investigating and counteracting unlawful conduct by Defendant thus perceptibly impaired FHCST's mission by forcing the cancellation and curtailment of its planned efforts to promote fair housing and eliminate discriminatory housing practices activities.

55.     Unless enjoined, Defendant has stated that it will continue to engage in the unlawful conduct described herein and Plaintiff's injuries will increase because it will have to continue diverting resources and curtailing its other activities to counteract Defendant's conduct.

## CAUSES OF ACTION

### Count I

### Federal Fair Housing Act, 42 U.S.C. §§ 3604(c), 3604(f)(1), 3604(f)(2), and 3604(f)(3)

56.     Plaintiff realleges and reincorporates by reference the allegations set forth above.

57.     Defendant's acts, policies, and practices, as described above, constitute intentional discrimination in the sale of a dwelling or otherwise make housing unavailable or deny a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(1).

58.     Defendant's express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of 42 U.S.C. § 3604(f)(1).

59.     Defendant's acts, policies, and practices, as described above, constitute intentional discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2).

60.     Defendant's express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of 42 U.S.C. § 3604(f)(2).

61.     Defendant's acts, policies, and practices as described above, constitute a refusal to permit requests for reasonable accommodations and reasonable modifications and a failure to engage in the required interactive process, in violation of 42 U.S.C. § 3604(f)(3).

62.     Defendant's acts, including those through its agents, as described above, constitute the making, printing, publishing and/or have the effect of making, printing, or publishing a notice, statement, or advertisement that is about the sale or rental of a dwelling and that indicates preferences, limitations, and/or discrimination or the intention to make preferences, limitations, and/or discrimination because of disability in violation of 42 U.S.C. § 3604(c).

63.     Defendant's acts, policies, and practices as described above, constitute a continuing violation of the Fair Housing Act from their initiation through the present.

64.     As a result of the discrimination alleged in the previous paragraphs, FHCST has sustained the injuries described herein.

**Count II**

**Texas Fair Housing Act, Tex. Prop. Code Ann. §§ 301.022, 301.025(a), 301.025(b), and 301.025(c)**

65.    Plaintiff realleges and incorporates by reference the allegations set forth above.

66.    Defendant's acts, policies, and practices, as described above, constitute intentional discrimination in the sale of a dwelling, or otherwise make housing unavailable or deny a dwelling because of disability, in violation of Tex. Prop. Code Ann. § 301.025(a).

67.    Defendant's express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of Tex. Prop. Code Ann. § 301.025(a).

68.    Defendant's acts, policies, and practices, as described above, constitute intentional discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of Tex. Prop. Code Ann. § 301.025(b).

69.    Defendant's express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of Tex. Prop. Code Ann. § 301.025(b).

70.    Defendant's acts, policies, and practices as described above, constitute a refusal to permit requests for reasonable accommodations and reasonable modifications and a failure to engage in the required interactive process, in violation of 42 U.S.C. § 301.025(c).

71.    Defendant's acts, including those through its agents, as described above, constitute the making, printing, publishing and/or have the effect of making, printing, or publishing a notice, statement, or advertisement that is about the sale or rental of a dwelling and that indicates preferences, limitations, and/or discrimination or the intention to make preferences,

20

limitations, and/or discrimination because of disability in violation of Tex. Prop. Code Ann. § 301.022.

72.     Defendant's acts, policies, and practices as described above, constitute a continuing violation of the Fair Housing Act from their initiation through the present.

73.     As a result of the discrimination alleged in the previous paragraphs, FHCST has sustained the injuries described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

(1)     enter a declaratory judgment that the foregoing actions of Defendant violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and the Texas Fair Housing Act, Tex. Prop. Code Ann. § 301.001, *et seq.*;

(2)     enter a permanent injunction directing Defendant and its agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3)     award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its diversion of resources, frustration of mission, out-of-pocket costs, and any other damages that have been caused by the conduct of Defendant alleged herein;

(4)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendant for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)     award Plaintiff its reasonable attorneys' fees and costs; and

(6)     order such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.


Date: November 9, 2023

/s/ Reed Colfax
Reed Colfax (Bar No. 471430)
Nicholas Abbott*
Emahunn Campbell*
RELMAN COLFAX, PLLC
1225 19th St., NW
Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
Email: rcolfax@relmanlaw.com
Email: nabbott@relmanlaw.com
Email: ecampbell@relmanlaw.com

*Attorneys for Plaintiff Fair Housing Council of South Texas*

**Pro hac vice* application to be filed